James HANJY and J & J Virtual Communications, LLC, on behalf of themselves and all others similarly situated, Plaintiffs

v.

ARVEST BANK, Defendant.

Case No. 4:14–cv–00006–KGB.

United States District Court,
E.D. Arkansas,
Western Division.

Signed March 31, 2015.

E. Adam Webb, Webb, Klase & Lemond, LLC, Atlanta, GA, Frank L. Watson, III, Watson Burns, PLLC, Memphis, TN, for Plaintiffs.

John C. Calhoun, Jr., James M. McHaney, Jr., Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., North Little Rock, AR, for Defendant.

## OPINION AND ORDER

KRISTINE G. BAKER, District Judge.

Plaintiffs James Hanjy and J & J Virtual Communications, LLC ("J & J") bring this action on behalf of themselves and all others similarly situated against defendant Arvest Bank ("Arvest"). Plaintiffs assert claims for breach of contract and breach of

the covenant of good faith and fair dealing, unconscionable contract, and unjust enrichment based on Arvest's assessment and collection of overdraft fees for debit-card transactions (Dkt. No. 12).[1] Before the Court is Arvest's motion to dismiss plaintiffs' first amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. No. 15). Plaintiffs have responded (Dkt. No. 20), and Arvest has replied (Dkt. No. 24).

Before plaintiffs filed their response, Arvest filed an amended and supplemental brief in support of its motion to dismiss (Dkt. No. 19). Plaintiffs move to strike Arvest's supplemental brief (Dkt. No. 21), Arvest has responded to the motion to strike (Dkt. No. 23), and plaintiffs have replied (Dkt. No. 25). Plaintiffs subsequently filed a response to Arvest's supplemental brief (Dkt. No. 26), and Arvest replied (Dkt. No. 27). Plaintiffs also move to strike portions of this second reply (Dkt. No. 28), and Arvest has responded to the motion to strike (Dkt. No. 30).

In addition, plaintiffs filed two notices of subsequent authority (Dkt. Nos. 31, 33), and Arvest has responded to both (Dkt. Nos. 32, 34).

For the reasons that follow, the Court denies Arvest's motion to dismiss (Dkt. No. 15) and plaintiffs' motions to strike (Dkt. Nos. 21, 28).

## I. Background

Mr. Hanjy and J & J are former checking account customers of Arvest. Mr. Hanjy is a citizen of Missouri, and J & J is a Missouri limited liability company. Arvest is an Arkansas-chartered bank that operates branches in Arkansas, Kansas, Missouri, and Oklahoma (Dkt. No. 12,

¶ 15). Plaintiffs propose to represent under Rule 23 of the Federal Rules of Civil Procedure a class defined as:

> All Arvest customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Arvest's practices of assessing an overdraft fee on a debit card transaction at a time when the customer agreement did not provide for such a fee, assessing an overdraft fee even when a debit card transaction should not have been authorized, re-sequencing debit card transactions from highest to lowest dollar amount, or assessing overdraft fees even when a customer had sufficient funds in their account to cover all merchant requests for payment.

(Dkt. No. 12, ¶ 17).

According to plaintiffs' complaint, the terms of Arvest's checking accounts and its contracts with account holders are contained in a standardized deposit agreement and a document labeled "Electronic Funds Transfer Agreement and Disclosure" ("EFT agreement") (Dkt. No. 12, ¶¶ 33, 36). Plaintiffs have attached examples of deposit agreements and the EFT agreement as exhibits to their first amended complaint (Dkt. Nos. 12–1 to 12–4). Plaintiffs allege that, per the terms of the deposit agreement and the EFT agreement, Arvest's contracts with its checking account holders did not authorize Arvest to assess overdraft fees against debit card transactions, as opposed to credit card transactions. Plaintiffs further claim that the terms of the deposit agreement and EFT agreement suggest that debit card

---

**1.** In their original complaint, plaintiffs also had asserted a violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693, and the accompanying regulations, 12 C.F.R. part 205, but plaintiffs abandoned this claim in their first amended complaint (Dkt. Nos. 1, 12).

transactions would not be authorized if there were not adequate funds in the account. Plaintiffs allege that, contrary to these contractual terms, Arvest intentionally authorized debit card transactions even when the transaction was not covered by the customer's account balance in order to assess overdraft fees.

Plaintiffs further allege that Arvest engaged in manipulative practices to reorder debit card transactions from highest amount to lowest amount, in order to result in multiple transactions that incurred overdraft fees when those transactions, if processed in chronological order, would have resulted in only one overdraft and one overdraft fee. Plaintiffs allege that Arvest instituted this high-to-low posting for the sole purpose of maximizing overdraft transactions and, therefore, maximizing the amount of overdraft fees it charged to its customers. In addition to high-to-low posting, plaintiffs contend that Arvest held transactions for multiple days and batched transactions together.

Plaintiffs also claim that Arvest failed to provide to its customers accurate balance information. Specifically, plaintiffs allege that Arvest provided inaccurate balance information through its electronic network and on its website by virtue of its manipulation and reordering of transactions. As a result, plaintiffs allege that they and other customers generally did not have accurate balance information at the time they executed transactions and that the effect of this confusion was to encourage the customer to incur more overdraft charges.

Plaintiffs further allege that Arvest failed to provide notice of its overdraft practices. The deposit agreement provides that a checking account is "subject to charges, interest rates, and minimum balance requirements established from time to time" by Arvest and that Arvest may change such charges, interest rates, balance requirements, "or any other account terms, at any time, after such notice, if any, as is required by law, or if there is no specific requirement of law, then after reasonable notice." (Dkt. No. 12–3, at 2). Plaintiffs allege that Arvest never informed them of its intention to change the applicable contract terms to authorize the approval of debit card transactions when there were inadequate funds in the account or to assess overdraft fees on debit card transactions. Plaintiffs also allege that Arvest's contract does not disclose Arvest's allegedly improper debit reordering and overdraft assessment. In addition, plaintiffs allege that Arvest failed to notify customers of overdrafts or to advise customers of their right to opt out of Arvest's overdraft scheme until it became subject in 2010 to opt-out requirements imposed by regulations promulgated under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693. See 12 C.F.R. § 205.17.

For their first claim for relief, plaintiffs allege that Arvest breached the terms of its contracts with account holders by intentionally authorizing debit card transactions that would result in overdraft fees. Plaintiffs further allege that, through its overdraft practices and manipulation of debit-posting, Arvest breached the implied covenant of good faith and fair dealing.

Second, plaintiffs assert that Arvest's contracts with customers are unconscionable based on allegations that: Arvest failed to disclose the right to opt out of the overdraft scheme; Arvest did not obtain customers' affirmative consent prior to processing a transaction that would overdraw a customer's account and result in an overdraft fee; Arvest did not alert its customers that a debit card transaction would result in an overdraft fee and did not provide the customer the opportunity to cancel the transaction before assessing

fees; Arvest's contract with its customers is a contract of adhesion because it consists of standardized forms, Arvest has superior bargaining power, and the customers have no opportunity to negotiate; and the contract documents provided to Arvest's customers are deceptive, unfair, and misleading "in that, to any extent they give the Bank the right to impose the various overdraft policies described herein, they do so in a way that [is] grossly unfair, because the Bank's actual practices are never disclosed or permitted." (Dkt. No. 12, ¶ 90).

Lastly, plaintiffs assert unjust enrichment as an alternative theory for relief, alleging that it is inequitable for Arvest to retain the allegedly improperly assessed overdraft fees. Arvest moves to dismiss plaintiffs' first amended complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. Motions To Strike

■ Arvest's amended and supplemental brief in support of its motion to dismiss raises an argument that was not asserted in Arvest's original motion to dismiss or brief in support—Arvest's assertion that the National Banking Act ("NBA"), 12 U.S.C. § 21 *et seq.*, and Office of the Comptroller of the Currency ("OCC") regulations preempt plaintiffs' breach of contract claim. Plaintiffs move to strike Arvest's supplemental brief as untimely because it was filed almost a month after the deadline for Arvest to file a responsive pleading to plaintiffs' first amended complaint. Plaintiffs further argue that the supplemental brief is procedurally improper in that Arvest did not seek leave of the Court to file its supplemental brief and did not attempt to show excusable neglect for an untimely filing as required by Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure.

Arvest responds that, after filing its motion to dismiss, it became aware of an October 2013 federal case applying the NBA preemption analysis to state-chartered banks like Arvest. Arvest further states it believed that it would save judicial resources to raise the preemption issue in a supplemental brief, rather than as an affirmative defense in its answer, should an answer have become necessary.

The Eighth Circuit has described excusable neglect as "an elastic concept that empowers courts to provide relief where a party's failure to meet a deadline is caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Kurka v. Iowa Cnty.*, 628 F.3d 953, 959 (8th Cir. 2010) (internal quotation marks omitted) (quoting *Chorosevic v. MetLife Choices*, 600 F.3d 934, 946 (8th Cir.2010) (reviewing excusable neglect under Fed.R.Civ.P. 6)). "The determination of whether neglect is excusable is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* In determining whether excusable neglect exists, the Eighth Circuit has looked to the following "particularly important" factors: "(1) the possibility of prejudice to the defendant, (2) the length of delay and the potential impact on judicial proceedings, (3) the reason for the delay, including whether the delay was within the party's reasonable control, and (4) whether the party acted in good faith." *Id.* (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 496 F.3d 863, 866 (8th Cir.2007)).

The Court finds that Arvest has demonstrated excusable neglect for filing untimely its supplemental brief in support of its

motion to dismiss. Arvest has explained the reason for its delay, plaintiffs have responded fully to Arvest's supplemental motion and even filed notices of subsequent authority regarding preemption, and it is in the interest of judicial economy for the Court to consider the preemption arguments raised in Arvest's supplemental brief. The Court denies plaintiffs' motion to strike (Dkt. No. 21). The Court cautions Arvest, however, that filing a motion for leave with the proposed filing attached as an exhibit to that motion is the preferred course of action.

■ Plaintiffs also move to strike portions of Arvest's second reply in which Arvest challenges the sufficiency of plaintiffs' factual allegations. Plaintiffs argue that Arvest already raised this issue in its first brief in support of its motion to dismiss and its first reply and that Arvest's second reply should have been limited to preemption, the only issue discussed in plaintiffs' response to Arvest's supplemental brief. Arvest responds that it raised the pleading arguments in its second reply to distinguish the cases raised in plaintiffs' response to Arvest's supplemental brief.

■ As a general rule, courts in the Eighth Circuit will not consider arguments raised for the first time in a reply brief. *Barham v. Reliance Standard Life Ins. Co.,* 441 F.3d 581, 584 (8th Cir.2006); *Armstrong v. Am. Pallet Leasing Inc.,* 678 F.Supp.2d 827, 872 (N.D.Iowa 2009). The circumstances here are different. The arguments to which plaintiffs object in Arvest's second reply were raised in Arvest's original motion to dismiss and brief in support. For this reason, the Court denies plaintiffs' second motion to strike (Dkt. No. 28). Plaintiffs have had the opportunity to address these arguments in their briefings.

## III. Rule 12(b)(6) Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must satisfy the pleading requirement of Rule 8(a)(2), which requires "a short and plain statement of the claim that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); *see Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir.2009). "Specific facts are not necessary; · the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (internal quotation marks omitted). However, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (citations and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden,* 588 F.3d at 594 (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937).

## IV. Preemption

■ Arvest argues in its supplemental brief that the NBA and OCC regulations preempt plaintiffs' breach of contract

claims. "Business activities of national banks are controlled by the [NBA], 12 U.S.C. § 1 *et seq.,* and regulations promulgated thereunder by [the OCC]." *Watters v. Wachovia Bank, N.A.,* 550 U.S. 1, 6, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007). The NBA "vest[s] in nationally chartered banks enumerated powers and 'all such incidental powers as shall be necessary to carry on the business of banking.'" *Id.* at 11, 127 S.Ct. 1559 (quoting 12 U.S.C. § 24 Seventh). "[F]ederal control shields national banking from unduly burdensome and duplicative state regulation." *Id.* Generally speaking, the NBA and OCC regulations preempt state regulation that "prevent[s] or significantly interfere[s] with the national bank's exercise of its powers." *Barnett Bank of Marion Cnty., N.A. v. Nelson,* 517 U.S. 25, 33, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996).

The NBA applies to national banks. However, plaintiffs allege, and Arvest concedes, that Arvest is a state-chartered bank, specifically an Arkansas-chartered bank, not a national bank. The NBA does not apply to state-chartered banks. *See Mamot Feed Lot & Trucking v. Hobson,* 539 F.3d 898, 902 (8th Cir.2008). Arvest nonetheless claims that the preemptive force of the NBA and OCC regulations apply equally to it pursuant to 12 U.S.C. § 1831a(j)(1), a provision of the Federal Deposit Insurance Act ("FDIA"), as amended by the Riegle–Neal Amendments Act of 1997, Pub.L. 105–24, 111 Stat 238 (1997). Specifically, 12 U.S.C. § 1831a(j)(1) provides:

> The laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, shall apply to any branch in the host State of an out-of-State State bank to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank. To the extent host

> State law is inapplicable to a branch of an out-of-State State bank in such host State pursuant to the preceding sentence, home State law shall apply to such branch.

*Id.*

Arvest cites the decisions of several courts that have held, based on the text of § 1831a(j)(1) and the legislative history of the FDIA Riegle–Neal Amendments Act, that the FDIA preempts state laws applied to out-of-state banks to the same extent that the NBA and OCC regulations preempt state laws applied to national banks. *See Pereira v. Regions Bank,* 918 F.Supp.2d 1275, 1281–82 (M.D.Fla.2013) (holding, under 12 U.S.C. § 1831a(j)(1), that Florida statute prohibiting check cashing fees is preempted as to out-of-state state banks to the same extent as the statute is preempted as to national banks), *aff'd* 752 F.3d 1354, 1357 (11th Cir.2014); *Hawthorne v. Umpqua Bank,* No. 11–CV–06700–JST, 2013 WL 5781608, at *9 (N.D.Cal. Oct. 25, 2013) ("Insofar as Plaintiffs' [California Unfair Competition Law] claims would be preempted by the National Bank Act, they are preempted by the FDIA."); *see also Wells Fargo Bank of Texas NA v. James,* 321 F.3d 488, 490 n. 1 (5th Cir.2003) (stating without elaboration that defendants were state-chartered banks which "enjoy the same preemption rights as national banks pursuant to the [FDIA], 12 U.S.C. § 1831a(j)(1), and the Texas Constitution art. 16, § 16(c)."). To the extent that plaintiffs seek to represent customers in Arkansas and therefore invoke Arkansas law, Arvest is not an out-of-state bank, and it is not clear that the FDIA applies in that situation. As discussed below, however, Arvest also argues that Arkansas law precludes plaintiffs' claims.

Plaintiffs argue in response that Arvest's preemption defense would fail even if Arvest was a national bank subject to the NBA. Only at the conclusion of their response to Arvest's supplemental brief do plaintiffs state that they dispute that state-chartered banks are entitled to the same benefit of preemption as national banks, but plaintiffs make no attempt to address the reasoning of the courts discussing 12 U.S.C. § 1831a(j)(1). For purposes of resolving Arvest's motion to dismiss, the Court will assume, without deciding, that Arvest enjoys under 12 U.S.C. § 1831a(j)(1) the same preemption rights as national banks enjoy under the NBA.

■ Generally speaking, to decide the issue of preemption under the NBA and OCC regulations, courts must determine whether the state regulation "prevent[s] or significantly interfere[s] with the national bank's exercise of its powers." *Barnett,* 517 U.S. at 33, 116 S.Ct. 1103. In *Barnett,* the Supreme Court specifically asked whether the federal and state statutes were in "irreconcilable conflict"—for instance, whether compliance with both the federal and state law may be a "physical impossibility" or where the state restriction stands "as an obstacle to the accomplishment of the full purposes and objectives of Congress." 517 U.S. at 31, 116 S.Ct. 1103. Later, in *Watters,* the Supreme Court explained that national banks "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Watters,* 550 U.S. at 11, 127 S.Ct. 1559. "States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers. But when state prescriptions significantly impair the exercise of authority, enumerated

or incidental under the NBA, the State's regulations must give way." *Id.* at 12, 127 S.Ct. 1559.

In implementing the NBA, the OCC regulations confirm that the federally authorized "powers" of national banks include the power to impose non-interest fees such as overdraft fees. *See* 12 C.F.R. § 7.4002(a) ("Authority to impose charges and fees. A national bank may charge its customers non-interest charges and fees, including deposit account service charges."). Section 7.4002(b)(2) provides that the "establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles," and this section sets forth factors a national bank is supposed to use to establish those non-interest charges and fees. *Id.* When asked if the process followed by certain banks in deciding to use a high-to-low order of check posting is consistent with the safety and soundness considerations of 12 C.F.R. § 7.4002(b), the OCC stated in an interpretive letter that it agreed that a national bank's "decision to set fees based on a given order of check posting falls within the Banks' authority to set fees pursuant to section 4 (Seventh) and section 7.4002" and "that the process the Banks used in deciding to adopt the order of check posting described in your submissions is consistent with section 7.4002." OCC Inter. Ltr. 997, 2002 WL 32872368, at *3 (Apr. 15, 2002). *See also* OCC Inter. Ltr. 916, 2001 WL 1285359, at *1 (May 22, 2001) (stating agreement that a national bank "may establish a given order of posting as a pricing decision" pursuant to 12 U.S.C. § 24 (Seventh) and 12 C.F.R. § 7.4002).

The OCC also addresses federal preemption of regulations on deposit-taking

activities in 12 C.R.F. § 7.4007. Section 7.4007(b)(2) provides that "[a] national bank may exercise its deposit-taking powers without regard to state law limitations concerning: ... (2) Checking accounts; (3) Disclosure requirements; (4) Funds Availability; (5) Savings account orders of withdrawal...." *Id.*, § 7.4007(b)(2). Section 7.4007(c) clarifies that certain state laws are not preempted: "State laws on the following subjects are not inconsistent with the deposit-taking powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit-taking powers: (1) Contracts [and] (2) Torts...." *Id.* § 7.4007(c). *See In re Checking Account Overdraft Litig.*, 694 F.Supp.2d 1302, 1312–13 (S.D.Fla.2010) (discussing regulatory background and OCC interpretative letters).

Based on the above, Arvest contends that plaintiffs' claims for breach of contract are preempted. Arvest argues that plaintiffs may not challenge Arvest's ability to assess overdraft fees, seek to regulate Arvest's choice of a posting order by imposing a state-law "good faith" limitation on that choice, or seek to impose disclosure requirements beyond what is mandated by law. At this stage of the litigation, assuming that NBA preemption applies by virtue of the FDIA, the Court cannot say that plaintiffs' claims are preempted.

Other courts have declined to find preemption of state law claims directed at overdraft fees. As noted by a Florida district court considering multi-district litigation ("MDL") regarding debit card overdraft fees, the Supreme Court cases finding preemption based on the NBA "address state laws specifically targeted at national banks." *See In re Checking Account Overdraft Litig.*, 694 F.Supp.2d at 1311 (discussing *Watters*, 550 U.S. 1, 127

S.Ct. 1559; *Barnett*, 517 U.S. 25, 116 S.Ct. 1103; *Franklin Nat. Bank of Franklin Square v. New York*, 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (1954)). "State laws of general applicability, however, have been found not to be preempted." *Id.* (citing *Baldanzi v. WFC Holdings Corp.*, No. 07 CIV 9551–LTS–GWG, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("In contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted.")); *see also In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F.Supp.3d 34, 46 (E.D.N.Y.2014) (hereinafter *"In re HSBC"*) (collecting cases and stating that "federal courts addressing this type of alleged misconduct have declined to hold that state claims, based on both statutory and common law, are preempted by the NBA or OCC regulations."). As these courts recognize, the Supreme Court in *Watters* confirmed that national banks "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or general purpose of the NBA" and recognized that "contracts made by national banks are governed and construed by State laws." *Watters*, 550 U.S. at 11, 127 S.Ct. 1559 (internal quotation marks and citation omitted).

In the Florida MDL case, the court explained at the motion to dismiss stage that the plaintiffs' state law claims for breach of contract and breach of the covenant of good faith and fair dealing based on the defendants banks' high-to-low overdraft ordering "do no more than incidentally affect the banks' exercise of their deposit taking power and are therefore not preempted." *In re Checking Account Overdraft Litig.*, 694 F.Supp.2d at 1313–14.

The court explained in part that, while 12 C.F.R. § 7.4002 gives banks the right to charge overdraft fees, "it does not authorized banks to ignore general contract or tort law." *Id.* at 1313. The court further explained that the OCC's Interpretive Letter 997 does not authorize debit card postings in a high to low order to increase fees but "merely states that doing so does not *violate* the OCC's requirement that banks set fees using sound banking judgment. A bank could follow both the requirements of sound banking judgment outlined in [12 C.F.R. § 7.4007] and good faith; these principals are not in irreconcilable conflict." *Id.* Lastly, the court noted that the plaintiffs' alleged claims "are *not* that banks lack the right to charge overdraft fees as part of their deposit-taking powers. Instead, Plaintiffs attack the allegedly unlawful manner in which the banks operate their overdraft programs to maximize fees at the expense of consumers." *Id.* at 1313. The court reaffirmed its position in denying a motion for reconsideration, distinguishing an Eleventh Circuit decision that the NBA preempted a Florida statute limiting banks' right to charge check cashing fees, *Baptista v. JP Morgan Chase Bank, N.A.,* 640 F.3d 1194 (11th Cir.2011). *See In re Checking Account Overdraft Litig.,* 797 F.Supp.2d 1312, 1322 (M.D.Fla.2011) ("A desire to limit a bank's authority to charge a fee is not synonymous with a desire to hold a bank liable for the bad-faith manner in which an account is reorganized to justify a larger number of overdraft fees.").

Other courts have followed the Florida MDL court in declining, at the motion to dismiss stage, to find preemption of state law claims regarding banks' debit posting practices. *See In re HSBC,* 1 F.Supp.3d 34, 45–49; *King v. Carolina First Bank,* 26 F.Supp.3d 510, 516–17 (D.S.C.2014); *Hughes v. TD Bank, N.A.,* 856 F.Supp.2d 673, 680 (D.N.J.2012).

In arguing for preemption, Arvest relies heavily on the Ninth Circuit's decision in *Gutierrez v. Wells Fargo Bank, NA,* 704 F.3d 712 (9th Cir.2012). There, the plaintiffs challenged under California's consumer protection statute a national bank's debit high-to-low posting practices, claimed that the bank failed to disclose its posting practices, and claim that the bank made fraudulent misrepresentations regarding its posting practices. The Ninth Circuit held that the NBA preempted the "unfair" business practices prong of the state statute as applied to the high-to-low posting practices, reasoning that, because the OCC considers posting orders to be a pricing decision authorized by federal law, federal courts cannot mandate the order in which a bank posts its transactions. *Id.* at 725. Arvest also cites the decision of a California district court extending the Ninth Circuit's reasoning in *Gutierrez* to find preemption of claims of breach of the covenant of good faith and fair dealing. *See Hawthorne v. Umpqua Bank,* No. 11–CV–06700–JST, 2013 WL 5781608, at *12 (N.D.Cal. Oct. 25, 2013). As plaintiffs note, *Hawthorne* is the only case Arvest cites in which a court concluded contractual claims, as opposed to claims based on state statutes or regulations, should be preempted. In contrast to the Ninth Circuit's reasoning in *Gutierrez,* the Florida MDL court when declining to find these claims preempted stated, "Plaintiffs do not ask the Court to tell the banks *how* to order transactions, but simply that the ordering must be carried out as contemplated by the covenant of good faith and fair dealing." *In re Checking Account Overdraft Litig.,* 694 F.Supp.2d at 1315. The district courts *In re HSBC,* 1 F.Supp.3d at 48, and *King,* 26 F.Supp.3d at 516–17, expressly considered *Gutierrez* and declined to find preemption as to claims re-

garding debit re-sequencing and high-to-low posting practices.

This Court finds persuasive the reasoning of the courts that have declined to find preempted claims similar to the claims plaintiffs raise here regarding debit posting practices. At this stage of the proceedings, the Court finds that plaintiffs' allegations and claims for breach of contract and breach of the implied covenant of good faith and fair dealing "do no more than incidentally affect the banks' exercise of their deposit taking power and are therefore not preempted." *In re Checking Account Overdraft Litig.*, 694 F.Supp.2d at 1313–14. Here, plaintiffs do not seek to challenge Arvest's authority or ability to charge overdraft fees under the applicable federal or state regulatory schemes. Rather, on their direct breach claims, plaintiffs seek to hold Arvest to the terms of its contracts with plaintiffs and the putative class members, which contracts plaintiffs claim do not authorize overdrafts and overdraft fees for debit card transactions. While 12 C.F.R. § 7.4002 gives banks the right to charge overdraft fees, "it does not authorize banks to ignore general contract or tort law." *In re Checking Account Overdraft Litig.*, 694 F.Supp.2d at 1313. Likewise, plaintiffs' claim for breach of the covenant of good faith and fair dealing challenges the alleged manner in which debt-card transactions are reorganized in order to maximize fees at the expense of customers. *Id.*

█ Arvest also relies on the Ninth Circuit's decision in *Gutierrez* to argue that the NBA preempts plaintiffs' claim for breach of the covenant of good faith and fair dealing based on Arvest's alleged failure to disclose its posting and overdraft policies to its customers. In *Gutierrez*, the Ninth Circuit held that that NBA preempts the "unfair" business practices prong of California's consumer protection

statute as to plaintiffs' claims alleging a failure to make particular disclosures based on 12 C.F.R. § 7.4007(b)(3), which provides that a national bank "may exercise its deposit-taking powers without regard to state law limitations concerning," among other things, "disclosure requirements." 704 F.3d at 726. On the other hand, in *Gutierrez*, the court did not find preemption as to the "fraudulent" prong of California's consumer protection law as to plaintiffs' claims alleging affirmative misrepresentations. 704 F.3d at 726.

The district court in *In re HSBC*, 1 F.Supp.3d 34, rejected the *Gutierrez* analysis as to posting practices but nevertheless followed the analysis in *Gutierrez* to find preempted claims based on the bank's alleged failure to disclose its posting methods. *See In re HSBC*, 1 F.Supp.3d at 48 ("Thus, in this case, the Court finds that inasmuch as the Plaintiffs seek to impose liability on HSBC for the bank's failure to sufficiently disclose its posting method, that argument is preempted."). The *In re HSBC* court relied in part on the statement by another district court that, " '[t]o the extent the plaintiffs asserted that the bank did not adequately disclose its check-posting policies, "those claims may well be preempted." ' " *Id.* (quoting *White v. Wachovia Bank, N.A.*, 563 F.Supp.2d 1358, 1369 n. 15 (N.D.Ga.2008)). This Court notes, however, that the *White* court went on to conclude that the plaintiffs' "disclosure-related allegations are intertwined with their claims that some of the overdraft fees were altogether improper. As a whole, the claims Plaintiffs have stated are plausible based on the facts alleged, so the court will not dismiss the claims on preemption grounds before any discovery has taken place." *White*, 563 F.Supp.2d at 1369 n. 15.

In *In re Checking Account Overdraft Litigation*, 694 F.Supp.2d 1302, and *King*,

26 F.Supp.3d 510, the plaintiffs' allegations included that the banks did not disclose their posting policies, and those courts declined to find preemption. The courts did not discuss disclosure-related allegations separately, but the import of those courts' decisions is that, although 12 C.F.R. § 7.4007(b)(3) provides that a national bank may exercise its deposit-taking powers without regard to state law limitations concerning disclosure requirements, contract-related claims alleging bad faith based in part on disclosure practices may only incidentally affect a national bank's deposit-taking powers and thus be permissible under § 7.4007(c)(1) and *Barnett,* 517 U.S. 25, 116 S.Ct. 1103.

Here, plaintiffs' claims regarding Arvest's disclosures are based in part on express contractual terms and are but one factor in plaintiffs' claim for breach of the covenant of good faith and fair dealing. In view of this, and given that the Court is only assuming without deciding that Arvest enjoys preemption under the FDIA to the same extent as national banks under the NBA, the Court declines to find at this time that plaintiffs' allegations regarding Arvest's disclosures are preempted.

## V. Plaintiffs' Claims

Beyond preemption, Arvest argues that the contracts at issue explicitly authorize Arvest to charge fees and debit card overdrafts, that federal and state law permit the alleged high-to-low posting, that plaintiffs cannot assert an affirmative claim for unconscionability, and that certain of plaintiffs' factual allegations relating to each claim are insufficient. The Court will first address the issue of the proper substantive law to apply.

### A. Choice of Law

▮ In determining a choice-of-law issue in a diversity action, a federal court looks to the choice-of-law principles of the forum state. *Simpson v. Liberty Mut. Ins. Co.,* 28 F.3d 763, 764 (8th Cir.1994). Thus, Arkansas's choice-of-law principles govern what state's substantive law applies. Arkansas courts will enforce a contractual choice-of-law clause, provided that the law selected is reasonably related to the contract at issue and does not violate a fundamental public policy of the forum state. *Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.,* 926 F.Supp. 835, 841 (E.D.Ark.1996) (collecting cases), *aff'd,* 112 F.3d 513 (8th Cir.1997). Absent an effective choice-of-law provision, Arkansas courts generally apply the "most significant relationship" test to breach of contract claims. *Fuller v. Hartford Life Ins. Co.,* 281 F.3d 704, 707 (8th Cir.2002); *Scottsdale Ins. Co. v. Morrowland Valley Co., LLC,* 2012 Ark. 247, 411 S.W.3d 184, 189 (2012). At least one court in this district has applied the most significant relationship test where there were conflicting choice-of-law provisions. *See Coorstek, Inc. v. Elec. Melting Servs. Co.,* No. 4:06CV1726JMM, 2008 WL 160620, at *3 (E.D.Ark. Jan. 15, 2008).

The parties acknowledge that the documents attached to plaintiffs' pleadings contain differing choice-of-law provisions. One example deposit agreement attached to plaintiffs' first amended complaint states that the agreement is governed by Arkansas law (Dkt. No. 12–3). The deposit agreements that Mr. Hanjy and J & J signed state that Missouri law governs (Dkt. Nos. 121, 12–2). However, the parties agree at this stage of the litigation that the laws of Arkansas and Missouri are substantially the same with regard to plaintiffs' common-law claims, and both parties cite both Arkansas and Missouri law in their briefing. At this stage of the litigation, the Court, like the parties, will analyze Arvest's motion and plaintiffs' claims under Arkansas and Missouri law.

The Court acknowledges that, based on plaintiffs' proposed class, it may become necessary in the future to apply a particular state's law to a particular plaintiff or set of plaintiffs. Any arguments regarding specific plaintiffs or specific states may be raised at a later stage upon consideration of a motion for class certification or motion for summary judgment.

### B. Breach of Contract

 In addition to arguing preemption, Arvest moves to dismiss plaintiffs' breach of contract claim because Arvest contends that, by virtue of language in its contracts, its customers expressly authorize Arvest to charge fees for debit card overdrafts. Plaintiffs dispute this interpretation of the contracts and expressly allege otherwise in their pleadings.

Both parties cite the "Withdrawals" paragraph of the various deposit agreements. This provision provides in part, "A check that will overdraw the available account balance will trigger a service charge, whether we pay the item or dishonor it." (Dkt. No. 12–3, at 2). Plaintiffs argue, based on this provision, that the deposit agreement only authorizes overdraft charges on checks, without mentioning or authorizing overdraft charges for debit transactions. Plaintiffs also argue that the EFT agreement contains no language authorizing Arvest to assess overdraft fees against debit card transactions. Further, plaintiffs argue that several provisions of the EFT agreement suggest that debit card transactions will not be authorized if there are not adequate funds in the accounts. Specifically, plaintiffs cite the statement in paragraph seven of the EFT agreement stating, "You may withdraw up to $600.00 per business day (but not more than the funds available in the account for withdrawal) from an electronic terminal that accepts your Arvest ATM Card." (Dkt. No. 12–4). Plaintiffs also cite paragraph 13 of the EFT agreement, which provides in part that Arvest is not responsible for not processing transfers that are not covered by sufficient funds.

Arvest acknowledges that the deposit agreement specifically refers to overdrafts on "[a] check that will overdraw the available balance." Arvest points, however, to the following provisions of the EFT agreement:

1. You are responsible and liable for all authorized transactions made through the use of the Access Device and for all authorized transactions made under any preauthorized transfer. All such transactions are subject to all applicable agreements, rules and regulations of Financial Institution's checking accounts and savings accounts for which Access Device use or preauthorized transfers are authorized, now or in the future, as said agreements, rules and regulations are now in effect or as they may hereafter be amended, modified, or adopted.

2. You authorize the Financial Institution to charge your checking account(s) and savings account(s) for all authorized transactions resulting from the use of the Access Device or resulting from any preauthorized transfer and you assume all responsibility and liability for all such Access Device use and preauthorized transfers.

(Dkt. No. 12–4).

Arvest argues that, taken with the deposit agreement's authorization of overdraft charges on check transactions, these provisions of the EFT agreement authorize overdraft fees for debit transactions. Arvest offers little elaboration this argument beyond quoting the above provisions and asserting its conclusion. Arvest further argues that debit transactions should be subject to the withdrawal provisions of the deposit agreement based on Arvest's

assertion that the use of a debit card is essentially the same as writing a check. Plaintiffs, in their first amended complaint and in their briefing, contend that debit transactions are very different from check transactions. Neither party cites or seeks to apply state law on contract interpretation.

At this stage of the litigation, based on the allegations in plaintiffs' first amended complaint and the contract documents attached to plaintiffs' first amended complaint, the Court cannot say that Arvest's contracts with plaintiffs expressly authorized overdrafts and overdraft fees for debit card transactions. The Court denies Arvest's motion to dismiss on this basis. The parties may revisit the issue of contract interpretation at a later stage of this proceeding.

## C. Breach Of The Covenant Of Good Faith And Fair Dealing

 Plaintiffs also allege in their complaint that Arvest breached the implied covenant of good faith and fair dealing. Under Arkansas and Missouri law, every contract contains an implied covenant of good faith and fair dealing. *Yarborough v. DeVilbiss Air Power, Inc.,* 321 F.3d 728, 732 (8th Cir.2003) (Arkansas law); *Cantrell–Waind & Associates, Inc. v. Guillaume Motorsports, Inc.,* 62 Ark. App. 66, 968 S.W.2d 72, 75 (1998) (quoting *Restatement (Second) of Contracts* § 205 (1981)); *Swartz v. Mann,* 160 S.W.3d 411, 414 (Mo.Ct.App.2005). "As is the case with the contract's express terms, the implied covenant is part of the contract and creates contractual obligations that are actionable." *Yarborough,* 321 F.3d at 732. "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Restatement (Second) of Contracts* § 205, cmt. a (1981); *see Missouri*

*Consol. Health Care Plan v. Cmty. Health Plan,* 81 S.W.3d 34, 47 (Mo.Ct.App.2002) (quoting same).

Arvest first moves to dismiss to the extent that plaintiffs seek to assert breach of the covenant of good faith and fair dealing as an independent cause of action. The Court rejects this basis for dismissal, as plaintiffs assert this claim as a general breach of contract claim, not as a separate cause of action.

 Arvest also argues for dismissal by repeating its contention that its contracts with plaintiffs and the putative class members expressly authorized Arvest to charge a fee for debit overdrafts. "As a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." 23 *Williston on Contracts* § 63:22 (4th ed.); *see Al–Khaldiya Electronics & Elec. Equip. Co. v. Boeing Co.,* 571 F.3d 754, 758–59 (8th Cir.2009) (stating same under Missouri law); *Gunn v. Farmers Ins. Exch.,* 2010 Ark. 434, 372 S.W.3d 346, 351 (2010) ("[A]n implied covenant should not be used to limit an expressly bargained-for term."). As stated above, the Court cannot say at this time that the contract expressly authorizes debit card overdraft fees. Moreover, plaintiffs' claim for breach of the covenant of good faith and fair dealing is not limited to the fact that Arvest charged overdraft fees; plaintiffs' claim encompasses Arvest's alleged bad faith practices with regard to the manner in which it processed debit card transactions and assessed overdraft fees on debit card transactions. *See In re Checking Account Overdraft Litig.,* 694 F.Supp.2d at 1317 (stating, with regard to claim of breach of covenant of good faith, that any factual questions about how the banks op-

erate are matters to be developed through discovery); *White,* 563 F.Supp.2d at 1364 (declining to find as a matter of law that portions of deposit agreement providing that bank "may" post items "in any order" expressly gave the bank the right to manipulate transactions in order to maximize overdraft fees in the ways alleged in the plaintiffs' complaint and finding that good faith was question of fact for discovery).

Specifically as to plaintiffs' allegations of high-to-low posting, Arvest argues that the implied covenant of good faith and fair dealing cannot prohibit a practice that state law and federal regulatory pronouncements specifically permit. Specifically, Arvest claims that both Arkansas's and Missouri's versions of Uniform Commercial Code ("UCC") § 4–303(b) vest Arvest with complete discretion to post items in any order, including high-to-low posting. *See* Ark.Code Ann. § 4–4–403(b), cmt. 7 ("Under subsection (b) the bank has the right to pay items for which it is itself liable ahead of those for which it is not."); Mo. Ann. Stat. § 400.4–303, cmt. 7 (same). Arvest concedes that UCC Article 4 and § 4–303(b) apply to paper checks, not debit card transactions, but Arvest argues that the same principles should apply to debit card transactions. This Court is not convinced that it can extend UCC § 4–303(b) to cover debit card transactions. As stated by the Florida MDL court in rejecting the same argument Arvest now makes, "[t]he UCC's generally accepted principles when dealing with checks cannot be broadly applied to debit card transactions. To do so would be to ignore the fundamental differences between the two." *In re Checking Account Overdraft Litig.,* 694 F.Supp.2d at 1316.

Arvest nevertheless contends that the UCC should be read as approving of high-to-low posting based on provisions of UCC Article 4A pertaining to fund trans-

fers and, in particular, the processing of payment orders. *See* Ark.Code Ann. § 4–4A–504(a) (allowing for processing of electronic payment orders in any sequence); Mo. Ann. Stat. § 400.4A–504(a) (same). UCC Article 4A, as adopted in Arkansas and Missouri, expressly excludes "a funds transfer any part of which is governed by the [EFTA]." Ark.Code Ann. § 4–4A–108(a); Mo. Ann. Stat. § 400.4A–108(a). Debit card transactions are within the scope of the EFTA, 15 U.S.C.A. § 1693a(7), and are therefore expressly outside the scope of UCC Article 4A. *See In re Checking Account Overdraft Litig.,* 883 F.Supp.2d 1244, 1247 (S.D.Fla.2012) (rejecting similar arguments under UCC Article 4A as adopted in Georgia).

Arvest further asserts that its high-to-low practices are specifically authorized by federal law. Arvest cites a January 2009 comment in the Federal Register by the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision, Treasury, and the National Credit Union Administration, in which those agencies decided pursuant to their authority under section 5(a) of the Federal Trade Commission Act ("FTCA") not to adopt a rule requiring the use of any particular posting order for debit card and other transactions. *See* 74 Fed.Reg. 5498, 5547–58 (Jan. 29, 2009). That comment states in part, "[t]he Agencies are not addressing transaction processing order at this time. The Agencies believe that it would be difficult to set forth a bright-line rule that would clearly result in the best outcome for all or most consumers." *Id.* at 5548. That those authorities declined to adopt a bright-line rule under the FTCA as to transaction processing orders does not mean that Arvest's alleged practices are specifically authorized by federal law, as Arvest suggests. Arvest also states that a study of the Consumer Protection Finan-

cial Bureau has observed that posting orders vary considerably from institution to institution. The Court is at a loss to understand how this study establishes that federal law authorized Arvest to engage in the alleged manipulative high-to-low posting practices plaintiffs' first amended complaint claims.

▪ Arvest also challenges the sufficiency of plaintiffs' factual allegations underlying their claim for breach of the covenant of good faith and fair dealing. First, Arvest asserts that plaintiffs' allegations as to Arvest's high-to-low posting fail to satisfy the pleading requirements of *Twombly* and *Iqbal.* Arvest argues that plaintiffs' first amended complaint is totally devoid of any specifics on this issue. The Court disagrees. Plaintiffs' allegations are more than sufficient to put Arvest on fair notice as to the nature of its claim. Arvest further argues that these allegations do not satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires a party alleging fraud or mistake "to state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). Plaintiffs' allegations regarding Arvest's high-to-low posting practices are not allegations of fraud or mistake, and Rule 9(b) does not apply. To the extent plaintiffs allege bad faith or that Arvest intentionally manipulated the order in which it posted transactions, Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

▪ Arvest also challenges the sufficiency of plaintiffs' allegations of Arvest's "cloaking of accurate balance information" (Dkt. No. 12, ¶¶ 51–55), arguing that plaintiffs offer no specifics and that their allegations do not satisfy Rule 9(b). The Court rejects this argument. Plaintiffs' first amended complaint alleges that Arvest provided inaccurate balance information to plaintiffs and other customers through its electronic network, by displaying transactions on its website contrary to the order in which transactions were actually posted, and by formatting monthly statements to hide its true ordering practices. Plaintiffs do not specifically allege fraud, but even if Rule 9(b) applies here, plaintiffs' allegations regarding inaccurate balance information provide sufficient detail.

In addition, Arvest raises Rule 9(b) in challenging the sufficiency of plaintiffs' allegation that Arvest "batched" transactions (Dkt. No. 12, ¶ 49). This allegation is not a separate claim but is part of plaintiffs' allegations regarding Arvest's high-to-low posting and reordering practices. This is not an allegation of fraud or mistake that implicates the heightened pleading requirements under Rule 9(b). Arvest further argues that plaintiffs fail to provide factual support that Arvest acted with an ulterior motive; Arvest contends that any allegation that it batched transactions is consistent with routine banking practices. Plaintiffs' allegations on this issue are sufficiently pleaded, and Arvest's factual allegations regarding routine banking practices are not a valid basis for dismissing plaintiffs' claim at this stage of the proceedings.

The Court denies Arvest's motion to dismiss plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

### D. Unconscionability

▪ Arvest moves to dismiss plaintiffs' unconscionability claim arguing that unconscionability is not an affirmative cause of action. The doctrine of unconscionability is used to avoid or limit the enforcement of a contract. *See Restatement (Second) of Contracts* § 208 (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to

enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."). Arvest is correct that that unconscionability generally is raised as a contractual defense. *See, e.g., Hughes v. Wet Seal Retail, Inc.,* No. 10–CV–05090, 2010 WL 4750216, at *2 (W.D.Ark. Nov. 16, 2010) (referring to unconscionability as a state-law contract defense); *Cowbell, LLC v. BORC Bldg. & Leasing Corp.,* 328 S.W.3d 399, 403, 405–07 (Mo.Ct.App.2010) (considering unconscionability raised as an affirmative defense).

■■■ In response, plaintiffs assert that this court should follow the Florida MDL court in *In re Checking Account Overdraft Litigation,* 694 F.Supp.2d 1302. There, recognizing that matters of defense generally can be raised affirmatively in a declaratory judgment action, the court agreed with the plaintiffs that the court could utilize its equitable powers to issue a declaratory decree that the contractual terms and practices were unconscionable and, if so, award damages for the banks' past enforcement of those terms. *Id.* at 1318. The court explained that, if it found overdraft fee provisions to be unconscionable, the court retained the authority and discretion to fashion appropriate equitable relief. *Id.* Moreover the court noted that "a declaration of unconscionability may affect the legal status of the contractual terms that Defendants seek to enforce, which may, in turn, affect the analysis of the other causes of action that Plaintiffs assert." *Id.* Finally, the court agreed that unconscionability ordinarily is asserted as a contract defense rather than an affirmative cause of action but stated:

> [T]his is not the ordinary case.... In the instant case, ... the bank is never required to file suit [to recover an over-

draft fee] because it is already in possession of the customer's money, and simply collects the fee by debiting the customer's account. Thus, the customer never has the opportunity to raise unconscionability as a defense for nonpayment. The only opportunity to do so is through a lawsuit filed by the customer, after payment has been made. Hence, the facts of the instant case weigh in favor of permitting Plaintiffs to pursue an unconscionability claim.

*Id.* at 1318–19. *See also Hughes,* 856 F.Supp.2d at 680–81 (agreeing with and following this reasoning).

In a more recent opinion, the Florida MDL court, at the summary judgment stage, adhered to its ruling on this issue when considering specifically Arkansas law. *In re Checking Account Overdraft Litig.,* No. 1:09–MD–02036–JLK, 2013 WL 5774287, at *8–9 (S.D.Fla. Oct. 24, 2013). The court noted that numerous courts have sustained claims seeking affirmatively declaratory relief that the terms of a contract are unenforceable. *Id.* at *9 (collecting cases).

Arkansas's and Missouri's declaratory judgment acts both allow for a determination of the validity of a written contract and a declaration of a person's rights, status, or other legal relations under a contract. *See* Ark.Code Ann. § 16–111–104; Mo. Ann. Stat. § 527.020. Accordingly, this Court agrees that plaintiffs are entitled to seek declaratory relief that the contracts at issue, or portions thereof, are unconscionable. As to damages, Arkansas's and Missouri's declaratory judgment acts provide for supplemental relief. *See* Ark.Code Ann. § 16–111–110(a) ("Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper."); Mo. Ann. Stat. § 527.080 (same). The Florida MDL court has determined at the summary judgment stage

that Arkansas law allows for monetary damages as a form of supplemental relief. *In re Checking Account Overdraft Litigation*, 2013 WL 5774287, at *9. Further, Missouri courts have expressly recognized that a petition for declaratory judgment may properly seek additional relief in the form of monetary damages. *See City of Creve Coeur v. Creve Coeur Fire Prot. Dist.*, 355 S.W.2d 857, 859 (Mo.1962).

At this stage of the proceedings, the Court finds persuasive the Florida MDL court's reasoning permitting an affirmative claim of unconscionability through a declaratory judgment action. The Court denies Arvest's motion to dismiss on this basis.

■■■■ Arvest argues that, even if unconscionability may be asserted as an affirmative cause of action, the contracts at issue are not unconscionable. Under Arkansas law, "[i]in assessing whether a particular contract or provision is unconscionable, the courts should review the totality of the circumstances surrounding the negotiation and execution of the contract." *State ex rel. Bryant v. R & A Inv. Co.*, 336 Ark. 289, 985 S.W.2d 299, 302 (1999) (quoting *Ark. Nat'l Life Ins. Co. v. Durbin*, 3 Ark. App. 170, 623 S.W.2d 548, 551 (1981)). "Two important considerations are whether there is a gross inequality of bargaining power between the parties to the contract and whether the aggrieved party was made aware of and comprehended the provision in question." *Id.* (quoting *Durbin*, 623 S.W.2d at 551). "The doctrine of unconscionability has both procedural and substantive elements. Procedural unconscionability deals with the manner in which a contract was entered into; substantive unconscionability, on the other hand, looks to the terms of the contract and whether they are harsh, one-sided, or oppressive." *Jarrett v. Panasonic Corp. of N. Am.*, 8 F.Supp.3d 1074, 1082 (E.D.Ark.2013) (in-

ternal quotation marks omitted). A party must prove both procedural and substantive unconscionability for an agreement to be unenforceable. *Id.* Likewise, under Missouri law, the court looks to the totality of the circumstances, and the court must find both procedural and substantive unconscionability. *See Cicle v. Chase Bank USA*, 583 F.3d 549, 554 (8th Cir.2009). "The determination of unconscionability is a mixed question of fact and law." *Gulfco of La., Inc. v. Brantley*, 2013 Ark. 367, 430 S.W.3d 7, 13 (2013); *see Restatement (Second) of Contracts* § 208 cmt. f. (1981) (same).

■■■■ As to procedural unconscionability, Arvest argues that the use of a form contract standing alone does not render the contracts here unconscionable. *See Geldermann & Co. v. Lane Processing, Inc.*, 527 F.2d 571, 576 (8th Cir.1975) ("The fact that the provision is part of a printed 'form' contract does not render it automatically unenforceable, particularly when all parties have knowingly assented to the inclusion of the provision." (citing 3 A. Corbin, *Contracts* § 559, at 270 n. 18 (1960))). Likewise, Arvest argues that being non-negotiable does not automatically render the contracts procedurally unconscionable. *See Cicle*, 583 F.3d at 555 (in context of credit card agreements, stating that "[t]hese sorts of take-it-or-leave-it agreements between businesses and consumers are used all the time in today's business world. If they were all deemed to be unconscionable and unenforceable contracts of adhesion, or if individual negotiation were required to make them enforceable, much of commerce would screech to a halt."). Plaintiffs do not allege only that there was an inequality in bargaining power or only that the contracts are form documents. Plaintiffs also allege that Arvest did not adequately disclose or notify plaintiffs of its practices.

Arvest also contends, however, that plaintiffs were under no compulsion to sign the contracts, had plenty of time to read and decide whether to sign the contracts, and had the option of opening accounts at other banks instead of Arvest. These are factual arguments that are not appropriately resolved at this stage of the proceedings.

Accepting as true the allegations in plaintiffs' first amended complaint and considering the totality of the circumstances, the Court finds that plaintiffs have sufficiently alleged procedural unconscionability. *See In re Checking Account Overdraft Litig.*, 694 F.Supp.2d at 1319–20 (finding that the plaintiffs sufficiently pleaded procedural unconscionability due to obvious disparity in sophistication and bargaining power, lack of opportunity to negotiate, and plaintiffs' allegations that they were not notified that they had the option to decline the overdraft service).

▮ Arvest next argues that the contracts at issue cannot be deemed substantively unconscionable because the alleged high-to-low posting practices are routine banking practices. The Court agrees with plaintiffs that this is a fact that has not been proven at this stage of the proceedings. Further, this Court is not convinced that, as a matter of law, being routine forecloses a finding that a practice or set of practices is unconscionable. Arvest also repeats its arguments that the UCC and federal banking regulatory agencies approve of high-to-low posting. The Court rejects these arguments for the reasons explained above. *See In re Checking Account Overdraft Litig.*, 694 F.Supp.2d at 1320–21 (rejecting the defendants' reliance on the UCC in arguing for dismissal of the plaintiffs' unconscionability claim).

Arvest argues that the contract cannot be substantively unconscionable in view of plaintiffs' control over their accounts and when overdrafts occur. Specifically, Arvest argues, "Plaintiffs do not, and cannot, allege that the bank's posting order actually caused their accounts to be overdrafted; they assert only that posting order affects the total number of fees incurred. But account-holders may avoid all fees simply by monitoring their spending habits and maintaining sufficient funds in their accounts." (Dkt. No. 16, at 24). In light of this control, Arvest contends that there can be no rational claim of unconscionability, citing two state court decisions dismissing unconscionability claims related to overdraft fees for dishonored checks. *See Daniels v. PNC Bank, N.A.*, 137 Ohio App.3d 247, 738 N.E.2d 447, 451 (2000) ("[A] person who chronically writes bad checks does not have clean hands to seek equitable relief from the resulting fees, since such a person is engaged in bad banking practices and is merely experiencing the intended deterrent effect of those fees."); *Saunders v. Mich. Ave. Nat. Bank*, 278 Ill.App.3d 307, 214 Ill.Dec. 1036, 662 N.E.2d 602, 611 (1996) ("Saunders argues that the excessive $220 charge in and of itself is adequate evidence of unconscionability. Such an argument, however, ignores Saunders' own role in establishing the charge."). This court is not persuaded by this argument or the cases Arvest cites.

Plaintiffs' claims pertain to debit card transactions, which differ from check transactions, and to Arvest's alleged practices of manipulating postings in a manner that resulted in more overdraft fees and which provided the plaintiffs with inaccurate balance information. To the extent Arvest contends or may contend that the alleged practices were contractually-authorized, plaintiffs allege that the contract is substantively unconscionable. This Court finds that plaintiffs have sufficiently alleged a claim of unconscionability. *See Hughes*, 856 F.Supp.2d at 681 (finding that

the plaintiffs alleged sufficient facts on their unconscionability claim where they alleged "that Defendant used its superior bargaining position and sophistication to develop a counterintuitive system of gouging those customers least able to afford overdraft fees—those with low bank account balances."); *In re Checking Account Overdraft Litig.*, 694 F.Supp.2d at 1320 (finding that the plaintiffs sufficiently pleaded substantive unconscionability where plaintiffs' complaint stated that the defendants' deposit agreements contained contractual terms regarding overdraft protection "that had the purpose and effect of allowing Defendants to reorder the posting of debit transactions to maximize the number and amount of overdraft fees charged to Plaintiffs, and that the fees bear no reasonable commercial relationship to the costs or risks associated with providing the overdraft service.").

The Court finds that plaintiffs have sufficiently alleged both procedural and substantive components of unconscionability. The Court denies Arvest's motion to dismiss plaintiffs' unconscionability claim.

### E. Unjust Enrichment

 Plaintiffs allege a claim of unjust enrichment as an alternative claim for relief in the event that plaintiffs are unsuccessful on their breach of contract claim or the contracts are deemed unenforceable. Arvest moves to dismiss this claim and argues that, based on Arvest's contention that plaintiffs' contract and unconscionability claims must fail, there is "no valid underpinning" for plaintiffs' unjust enrichment claim (Dkt. No. 16, at 25). Arvest goes on to argue that there can be no unjust enrichment for exercising a legal or contractual right.

 Unjust enrichment is an equitable doctrine. *Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 362 Ark. 598, 210 S.W.3d 101, 112 (2005). "It is the principle that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly." *Id.; see Brown v. Brown*, 152 S.W.3d 911, 916 (Mo.Ct.App. 2005) (describing unjust enrichment under Missouri law). Generally, unjust enrichment has no application when an express written contract covering the subject matter exists. *Servewell Plumbing*, 210 S.W.3d at 112; *Lowe v. Hill*, 430 S.W.3d 346, 349 (Mo.Ct.App.2014). Further, "[o]ne who is free from fault cannot be held to be unjustly enriched merely because he or she has chosen to exercise a legal or contractual right." *Campbell v. Asbury Auto., Inc.*, 2011 Ark. 157, 381 S.W.3d 21, 36 (2011); *see Whitley v. Irwin*, 250 Ark. 543, 465 S.W.2d 906, 910 (1971).

As an initial matter, Rule 8 permits plaintiffs to plead alternative claims, regardless of consistency. Fed.R.Civ.P. 8(d). Arvest contends that plaintiffs cannot succeed on their contract claim. If plaintiffs' contract claim fails, plaintiffs may be entitled to recover under a theory of unjust enrichment. Arvest does not address the sufficiency of plaintiffs' allegations of unjust enrichment other than referencing its arguments made as to plaintiffs' other claims and asserting that it had a contractual and legal right to assess overdraft fees. Arvest has not established that it had a contractual or legal right to assess overdraft fees or to manipulate debit transactions in bad faith as alleged in plaintiffs' first amended complaint. The Court finds that plaintiffs have sufficiently alleged a claim for unjust enrichment as an alternative claim for relief. *See In re*

*Checking Account Overdraft Litig.*, 694 F.Supp.2d at 1321 (denying motion to dismiss unjust enrichment claim based in part on alleged bad faith manipulating of debit transactions); *Hughes,* 856 F.Supp.2d at 682 (citing same and reaching same decision). The Court denies Arvest's motion to dismiss plaintiffs' unjust enrichment claim.

\* \* \*

For the foregoing reasons, the Court denies Arvest's motion to dismiss (Dkt. No. 15) and plaintiffs' motions to strike (Dkt. Nos. 21, 28).